In re the SECURITIES GROUPS, Debtor.

In re the SECURITIES GROUP, Debtor.

In re the MONETARY GROUP, Debtor.

In re the SECURITIES GROUP 1980, Debtor.

The SECURITIES GROUP, a New York general partnership; The Securities Group, a New York limited partnership; The Monetary Group, a New York limited partnership; and The Securities Group 1980, a New York limited partnership, Plaintiffs,

v.

Charles Agee ATKINS; Orin E. Atkins; Randall W. Atkins; Charles D. Barnett; and 500 Park Avenue Associates, a Kentucky limited partnership, Defendants.

Bankruptcy Nos. 84–BK–428–BK–J–GP, 84–430–BK–J–GP, 84–431–BK–J–GP and 84–433–BK–J–GP.
Adv. Nos. 85–218 to 85–221.

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

July 13, 1988.

' George E. Ridge, William G. Cooper, Jacksonville, Fla., for plaintiffs.

Guy R. Fairstein, New York City, James C. Rinaman, Jacksonville, Fla., for defendants Orin Atkins, Randall Atkins, 500 Park Avenue Asso., and Charles Barnett.

Alison D. Kennedy, Jacksonville, Fla., for Louis Lowin, Post–Confirmation Adm'r.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

These adversary proceedings are before the Court upon complaints filed by Louis Lowin, the Post–Confirmation Administrator of The Securities Groups, The Securities Group, The Securities Group 1980 and The Monetary Group. The complaints are predicated upon breaches of fiduciary duty, mis-appropriation of partnership opportunities and property, conversion, and violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq.*, arising out of the purchase and sale of real property in New York City with partnership funds.

These adversary proceedings were consolidated for trial which took place on April 9, 1987; July 16, 1987; September 10, 1987; and on December 17, 1987. At the conclusion of this trial, the parties were requested to submit legal memorandum and proposed findings of fact and conclusions of law. Upon the evidence offered, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. Plaintiffs are The Securities Groups (Groups), a New York general partnership, The Securities Group (TSG), a New York limited partnership, The Monetary Group (TMG), a New York limited partnership, and The Securities Group 1980 (TSG80), a New York limited partnership. Each is involved in Chapter 11 reorganization proceedings before this Court.

2. Defendant Charles Agee Atkins (Charles) was the managing partner of Groups, and managing partner and general partner of TSG, TMG and TSG80. A default has been duly entered against Charles. Accordingly, there is no issue of liability in these cases as to this defendant.

3. Defendant Orin E. Atkins (Orin), is the father of Charles and another defend-ant Randall W. Atkins. He was the original limited partner of TSG and TMG. He is a limited partner and the current general partner of defendant 500 Park Avenue Associates. He was for many years the president and then chairman of the board of Ashland Oil Company.

4. Defendant Randall W. Atkins (Randall) is the son of Orin and the brother of Charles. At all relevant times hereto, he was a general partner of TSG and a limited partner of both TMG and defendant 500 Park Avenue Associates (Associates). Plaintiffs suggest, and the Court finds, that Randall was also a *de facto* general partner of Associates by virtue of his active participation in its management.

5. Defendant Charles D. Barnett (Barnett) was, at all relevant times, a general partner of TSG and held an interest in the profits derived from Charles' general partnership interest in TSG80. Plaintiffs also assert and the Court finds that Barnett was a *de facto* general partner of TMG by virtue of his active participation in its management.

6. Defendant 500 Park Avenue Associates is a Kentucky limited partnership. Charles was its general partner until 1983. Orin is the successor general partner. Randall was an original limited partner of Associates and acted as its legal counsel.

7. TSG was formed as a New York limited partnership in 1978. By the summer of 1979, its business had grown to the point that its offices on three separate floors in the Seagram's Building, 375 Park Avenue, New York, were inadequate. New quarters were considered necessary, and Groups, as a general partnership then consisting of TSG and TMG, commenced an active search for new office space. Charles, as the general partner of Groups, involved two friends and business associates in this search. Their names were Steven A. Considine and Peter G. Schmidt. Considine was an employee of Ficor, Inc. (Ficor), a New York real estate brokerage company.

8. In August of 1979, Considine suggested that TSG lease space at 540 Madi-

son Avenue. This discussion soon turned to the possibility of purchasing the property and immediately thereafter, Considine met with Charles and Schmidt to consider such a transaction. During that meeting, Considine advised Ficor of these facts.

9. The building located at 540 Madison Avenue (Olivetti Building) was constructed about 1960 and is eleven stories tall. The Hotel Nassau, now demolished, was originally constructed in 1899 on the property adjacent to the Olivetti Building and had recently been used as a residential hotel for transients. The Olivetti Building and Hotel Nassau are referred to jointly as the "Property."

10. Olivetti Properties N.V., an affiliate of Olivetti Corporation of America, owned the fee and all improvements to the Hotel Nassau. Olivetti also owned the Olivetti Building but leased the ground under the building from Peter Kalikow. The ground lease restricted Olivetti's ability to mortgage, encumber or sublease (in its entirety) the Olivetti Building and presented an impediment to realizing the Property's full economic potential.

11. Soon after the preliminary negotiations started, Considine, as the primary broker with Ficor, specifically requested Charles to give him written authorization to act for TSG. On August 21, 1979, TSG formally authorized Considine and Ficor to act for it to acquire the Olivetti Building and Hotel Nassau. Considine promptly contacted the owner. It should be noted that Associates did not legally exist at this time. It was chartered on December 27, 1979, some four months later.

12. Charles directed Considine and Schmidt to come up with alternative proposals to purchase or lease the Olivetti Building for TSG and soon thereafter a proposal was prepared on its behalf.

13. On September 7, 1979, TSG retained the New York law firm of Weil, Gotshall & Manges (Weil) to assist in its acquisition of the Property. Charles Goldstein, the lead attorney representing the parties in this transaction testified that Weil was retained to render legal services to TSG in connection with either a lease of the Madison Avenue property or the possible acquisition of the Olivetti Building. Goldstein sent bills for the services rendered to The Securities Group. As noted previously, 500 Park Street Associates had not yet been formed. Goldstein also testified that Weil was definitely dealing with the name "The Securities Groups" in the negotiations with Olivetti, though he was unsure of the precise composition of the entity by that name. This testimony supports plaintiffs' contention that TSG was originally intended as the purchaser of the property.

14. On September 11, 1979, TSG, through Elihu Fier, a real estate partner at Weil, submitted its first offer to purchase the Property. This offer was revised and resubmitted the following day. Weil also prepared a leasing proposal and a brokerage agreement with Considine and Ficor to protect TSG. Concomitantly, Charles and TMG retained Randall on a 25-year consulting contract. Again, it is noted 500 Park Avenue Associates had not yet been formed.

15. The first indication that an entity other than TSG or Groups might purchase the Olivetti Building and Nassau Hotel came when Ficor attempted to obtain interim financing of $30 million for the purchase of the building. The name "500 Park Avenue Associates" surfaced for the first time in a proposal prepared by Ficor Associates, where it is referred to as the borrowing entity. The proposal describes 500 Park Avenue Associates as "a Limited Partnership, principals of which include major shareholders of The Securities Group and of The Monetary Group. The net worth of the individuals comprising the borrowing entity is estimated to be in excess of $50 million." The description is an obvious reference to Charles, Orin and Randall Atkins.

16. Ficor, after having represented TSG and Groups, ultimately obtained the exclusive right to obtain the financing for and to lease the Property for Associates on or about December 18, 1979. Significantly, and in exchange for this, Ficor agreed to indemnify TSG, Associates, Charles, Orin, Randall and Barnett, all of whom had been involved in the transaction, from any claim

its former broker, Considine, might make for a commission.

17. On November 2, 1979, Groups, through Charles, submitted another written offer to Olivetti. The name "500 Park Avenue Associates" was used in this offer. The Court again notes that this entity was not legally formed until December 27, 1980, almost two months later. Groups, among other things, agreed to furnish liquid collateral to enable Olivetti to leverage the long term lease it would acquire as part of the transaction.

18. On December 21, 1979, TSG secured an appraisal which shows that the Olivetti Building and the 20,000 square foot parcel on which the Hotel Nassau was located had a fee simple value of not less than $40 million.

19. Charles, Orin and Randall were on a family vacation in the Bahamas when Charles received a telephone call informing him that Olivetti was prepared to sign a contract for the sale of the Property. Orin generally told Charles and Randall that they should consult legal counsel on the question of whether or not there would be a conflict of interest for them to acquire the Property instead of Groups. Orin advised them to discuss the problem with the firm of Barnett and Alagia. Charles and Randall then returned to New York to conduct negotiations relating to the closing of that contract.

20. On December 26, 1979, Ficor forwarded to Associates in care of Groups a commitment from Manufacturers Hanover Trust Company (MHTC) to loan Associates $30 million for 30 months. The loan was to be secured by a first mortgage on the property and "an assignment of marketable securities satisfactory to us with a value of not less than $5 million."

21. On December 27, 1979, Associates was formed as a Kentucky limited partnership for the express purpose of purchasing the Property. Charles and Randall were the original partners with Orin and Schmidt later obtaining limited partnership interests. Associates was originally capitalized with less than $10,000. Randall, a member of the Kentucky Bar, acted as counsel in

the formation of Associates. Randall also represented Groups in the transaction.

22. On December 30, Charles and Randall caused Groups to transfer $1 million in cash and $4 million in marketable securities to Associates. This was done "in accordance with the terms of the Lease Agreement to be executed on December 31, 1979." Groups' obligation to pay rent under any version of the several leases introduced into evidence did not commence until February 15, 1980. An additional $2.5 million to $5 million was also transferred over the objection of Gubitosi, Kaltman and Hageman, three managers of Groups.

23. On December 31, 1979, Associates, and not Groups, acquired the Property from Olivetti for $22 million. The purchase price included $1 million cash, $4 million in marketable securities and a $17 million promissory note maturing in April, 1980. That same day Randall transferred from Groups to Associates the $1 million in cash and $4 million in marketable securities that he received the day before. The cash and collateral totaling $5 million necessary to close the transaction belonged to Groups.

24. One million of these funds went to Olivetti in partial payment of the purchase price. The $4 million in marketable securities was placed in an escrow account at Manufacturers Hanover under the joint control of Weil and the attorneys representing Olivetti.

25. In a separate but related transaction, $1 million in cash, paid directly from TSG, was used to purchase Kalikow's fee interest. This $1 million was not part of the funds transferred between Groups, Associates and Olivetti.

26. Documents in evidence support the following trial of funds from the treasuries of the plaintiffs to the sellers of the property:

(1) On December 30, 1979, one day prior to defendants' signing of the contract to purchase the Property, Groups transferred to Randall in escrow $1 million in cash and $4 million of First Pennsylvania Bank and Trust Company certificates of depos-

it maturing January 20, 1980. The funds were held in escrow and paid over to Associates the next day, December 31, 1979, the day on which the contract for the purchase of the Property was executed. (Plaintiffs' Exhibit 1).

(2) On December 31, 1979, Charles requested that $4 million in First Pennsylvania Bank and Trust Company certificates of deposit maturing on January 28, 1980, be transferred from account number 140–0–83100, a Groups bank account, to Randall, escrow agent for Associates, account number SE94–23. (Plaintiff's Exhibit 80).

(3) On December 31, 1979, the day after the $5 million had been paid by Groups, TSG "confirmed" to its auditors that Randall was in fact holding TSG's $1 million in cash and $4 million in certificates of deposit maturing January 28, 1980. (Plaintiffs' Exhibit 2).

(4) On December 31, 1979, the day after Randall received the $5 million escrow funds and the day of the signing of the contract by Associates to purchase the Property, Randall instructed Groups to pay the $5 million funds to Associates. (Plaintiff's Exhibit 3).

(5) Pursuant to Randall's letter of December 31, 1979, he, as escrow agent, transferred the $1 million in cash in cash and $4 million of First Pennsylvania Bank and Trust Company certificates of deposit, maturing January 22, 1980, to Associates. (Plaintiffs' Exhibit 115).

(6) On December 31, 1979, the date of the signing of the contract to purchase the Property, Olivetti acknowledged receipt of the sum of $1 million "constituting that portion of the purchase price to be paid to [Olivetti] by [Associates] pursuant to the provisions of Paragraph 1(c) of that certain Memorandum of Sale of even date herewith between [Olivetti] and [Associates]." On the same day that Randall released Groups' $1 million cash security deposit to Associates, Associates paid $1 million to Olivetti. (Plaintiffs' Exhibit 15A).

(7) Manufacturers Hanover wrote on January 3, 1980, confirming that the $1 million in cash had been transferred from Groups' account to Randall's escrow account and, subsequently, to Olivetti. The Manufacturers Hanover letter also confirmed that the $4 million in First Pennsylvania certificates of deposit maturing on January 28, 1980, were received by Manufacturers Hanover and subsequently withdrawn and paid over in escrow as part of the purchase of the Olivetti Building. (Plaintiffs' Exhibit 81).

(8) By letter dated January 10, 1980, from Robert Gubitosi of Groups to Manufacturers Hanover Trust Company, Groups confirmed that on December 31, 1979, it gave instructions to the bank for the following transactions: "Deposit of $1,000,000 and a $4,000,000 First Pennsylvania Certificate of Deposit to the 500 Park Avenue Associates special account." The letter also confirms that the $1 million cash and the $4 million certificate of deposit were then transferred into an escrow account to be held as the purchase price deposit for the Property. (Plaintiffs' Exhibit 79).

(9) The attorneys acting as escrow agents for buyer and seller issued a receipt for the remaining $4 million of the initial deposit for the purchase of the Olivetti Building. The receipt by the attorneys is for "certificates of deposit in the aggregate principal amount of $4 million payable to bearer on January 22, 1980, and issued by First Pennsylvania Bank, N.A." (Plaintiffs' Exhibit 15A).

(10) On January 11, 1980, TSG drew a $1 million check payable to Dreyer and Traub, escrow agents for the Kali-

kow transaction. The check was issued in the name of "Charles Agee Atkins and The Securities Group." (Plaintiffs' Exhibit 15A).

(11) On April 16, 1980, Associates and Peter Kalikow authorized the release of the $1 million held in escrow by Dreyer and Traub in order to pay the deposit to Kalikow for his interest in the fee. (Plaintiffs' Exhibit 15A)

[Despite conflicting references as to the maturity date, the certificate of deposit referred to above appears to be a single instrument.]

27. Between December 31, 1979, and January 1, 1980, Groups, through Charles as managing partner, entered into three written leases with Associates. One lease dated December 31, 1979, obligated Groups to lease the ninth, tenth and eleventh floors of the Olivetti Building and to post a "security deposit" for future rent of $1 million, and, as security for "tenant improvements," $4 million in marketable securities. The construction contemplated was the installation of a stairwell between the tenth and eleventh floors of the Olivetti Building and an upgrade in the office space. The "security deposits" represent 23% of the $22 million purchase price of the Property. The lease was signed December 31, 1979, before a notary public.

28. The second lease, also dated and signed December 31, 1979, obligated Groups to lease only the tenth and eleventh floors. Even though one-third less space was involved, it required the same $5 million "security deposits."

29. The third lease, dated one day later, obligated Groups to lease the ninth, tenth, and eleventh floors but did not require a security deposit.

30. Each of the leases was drafted by Weil on behalf of Associates or by Charles and/or Randall. Groups had no contractual obligation to begin paying any rent until February 15, 1980, but transferred $5 million as a "security deposit" to Associates the day before Associates acquired the Property according to the terms of the first lease. The signatures on all of the leases are identical and the signature pages on the leases appear to be mere copies of the signature page on the first lease. The same lawyer notarized each lease.

31. Associates used what is designated as "security deposits" to initially acquire and finance the purchase of the Property for Associates. The Court notes that only the third lease was presented to the interim lender, MHTC, and to the ultimate purchaser of the Property, The Equitable Life Assurance Society of the United States (Equitable). The terms of the third lease did not require a security deposit, which was contrary to the provisions of the other two leases. Again, it was this third lease which Associates held out to both MHTC and Equitable as evidence that there were no security deposits connected with Groups' lease. In reality, Associates used the security deposits as its own.

32. The Court rejects Orin and Randall's contentions that they did not know the source of the $5 million. Both are sophisticated and intelligent individuals and were thoroughly involved in all phases of the transactions. The Court notes in passing Orin's own statement:

I'm sure you're not that ... naive. Here are two boys, twenty-some years old, wandering off to New York to buy a piece of property. Now, I know what I was worth, and I had some idea of what they were worth, and I thought the chances of their buying this property were about as good as my flying out of this building. (Trial Transcript, Volume III, p. 309).

Clearly, Orin wondered where his sons could obtain resources to purchase a $25 million dollar building in New York City and must have known that Groups was the only possible source of funds of that magnitude.

33. On January 11, 1980, Associates contracted with Kalikow to obtain Kalikow's position on the Olivetti Building for $3 million. One million dollars of this purchase price was paid in cash into an escrow account. The balance was to be paid in April, 1980.

34. On January 15, 1980, the fully developed value of the Property was found to be $77.2 million. Of this value, $40.2 million was assigned to the value of the land under the Property and $37 million to the 110,000 square feet of the Olivetti Building and the 250,000 square feet office condominium tower to be constructed on the site of the Hotel Nassau. By deducting the estimated costs of demolishing the Hotel Nassau, $377,400, the costs of relocating existing tenants in the hotel, $382,500, and the value of Groups' long-term lease of the Olivetti Building, $9.4 million, the appraiser arrived at a fair market value of $67.2 million.

35. Immediately after obtaining the appraisal, Associates began marketing the property for sale. The evidence reveals that Charles, Randall and Peter Schmidt went to Europe and met with at least ten prospective purchasers.

36. On April 17, 1980, Associates closed on its $30 million loan from Manufacturers Hanover and effectively acquired Kalikow's interest in the Olivetti Building. The loan was secured by a mortgage on the Property, $6.8 million in marketable securities (an increase of $2.8 million from the original sale) and a collateral assignment of all of the leases in place at the Olivetti Building. The marketable securities were all owned by Groups.

37. Despite having three versions of Groups' leases to choose from at that time, Associates certified to Manufacturers Hanover that there were no leases in the Olivetti Building. Thus, Manufacturer's Hanover obtained no interest in the $5 million Groups had paid to Associates in December as a security deposit. If Manufacturers Hanover had, it probably would have been obligated to hold this money for Groups' benefit.

38. On May 15, 1981, Groups' independent certified public accountants issued their report on Groups' financial statements dated December 31, 1979. Their report noted:

*Note 2. Related Party Transactions.*

The Partnership [Groups] has entered into a 10–year lease agreement for the rental of office space (see Note 5). The Managing Partner is a general partner of the landlord limited partnership [Associates] (the "Landlord"). Another general partner of The Securities Group is a limited partner of the Landlord. Rent paid to the Landlord during the year ended December 31, 1980, amounted to $730,000. In connection with this lease, The Partnership was required to make a deposit of $1,000,000 in cash and $6,801,000 in securities, for bonding, with the Landlord.

The $1,000,000 in cash represents a security deposit for rents to be paid and is returnable, with interest, at the end of its lease term. The $6,801,000 in securities, for bonding, was required as security during the period in which the Partnership was making structural alterations to the leased premises and $5,501,000 was returned to the Partnership prior to December 31, 1980. The remaining $1,300,000 in securities will be returned upon the completion of the structural alterations. The $2,300,000 security deposit is included in the balance sheet caption "Other assets."

In addition, the Landlord has agreed to compensate the Partnership for advisory services rendered in connection with the acquisition of the building housing Partnership's leased premises. This agreement provides for a fee of $350,000 in each of the next ten years. The fee is payable annually and payment is contingent upon the Landlord attaining a defined level of earnings. The Partnership has not recognized any part of this fee for the year ended December 31, 1980.

\* \* \* \* \* \*

*Note 5. Commitments*

The Partnership is obligated under an operating lease dated December 31, 1979 (see Note 2). The lease term commenced February 15, 1980 and expires March 1, 1990. Minimum annual rentals through March 1, 1990 are as follows:

| Year ended December 31, | Minimum annual rentals |
|---|---|
| 1981 | $835,000 |
| \* \* \* \* | \* \* |

39. These same auditors verified that Groups had posted $7.8 million in total "security deposits" on either the first or second lease. On December 31, 1980, Groups still had $2.3 million on deposit with Associates under one of the two leases dated December 31, 1979. Apparently, the existence of the January 1, 1980, lease (the third lease) was obviously not disclosed to the accountants.

40. On July 24, 1980, Associates declared the December 31, 1979, lease for the ninth, tenth and eleventh floors void, and stated: "the only lease in force and effect for such premiums is the lease dated as of December 31, 1979, and providing for annual rentals of $834,500." Both of these versions of the lease called for the $5 million security deposit.

41. In mid–1980, Kaltman, Gubitosi and Hageman, managers of Groups, had reached the conclusion that all of the operating expenses of the eleven-story 500 Park Avenue building were being paid out of cash advances from Groups, though the building was now owned by Associates and Groups was merely a lessee of several floors. Expenses such as real estate taxes, monthly interest payments on the Manufacturers Hanover loan, building operating expenses, and legal fees relating to the acquisition of the building and fees relating to the Kalikow ground lease were all being funded by Groups. Additionally, fees of an attorney hired to vacate tenants from the Hotel Nassau, a building in which Groups had no offices, were being paid from Groups' treasury.

On March 31, 1980, TSG paid Ficor $225,000 as a commission for obtaining Manufacturer Hanover's $30 million loan commitment for Associates. In all, Groups had some two million dollars of its own assets tied up carrying certain costs of the Olivetti Building and Hotel Nassau, which were not owned by Groups. Kaltman, Gubitosi and Hagan complained to Charles of these expenditures and were told to "mind [your] own business ... if the limited partners wanted to invest in real estate they could have invested elsewhere." Charles said that he intended to keep the proceeds for himself and the other partners of Associates.

42. By the end of September, 1980, a major tenant, Amsterdam–Rotterdam Bank had been found to take the first seven floors of the Olivetti Building. Amsterdam–Rotterdam Bank was not required to post any security deposit with Associates in connection with its lease of 70% of the Olivetti Building.

43. In light of the fact that the Olivetti Building was now fully leased, Groups requested a release of the marketable securities being held by Manufacturers Hanover to secure Associates' $30 million loan.

44. In November, 1980, less than a year after its acquisition, the Property was again appraised, and the fair market value was increased to $73.5 million. Associates then sought to increase its mortgage loan from Manufacturers Hanover from $30 million to $40 million. The loan was ultimately increased by $7.5 million to $37.5 million.

45. On April 1, 1981, Groups and Associates entered into an amendment of the third lease dated January 1, 1980. This was the single lease which contained no obligation by Groups to furnish any security deposit. By the amendment, Groups leased the ninth floor and the annual rent was increased from $835,000 to $1,304,620.

46. In July, 1981, Associates began negotiations with The Equitable Life Assurance Society of the United States for the sale of the Property. Associates also agreed to pay Groups the sum of $800,000 "in light of the assistance Groups has rendered in the overall transaction." This fee was payable at the discretion of Associates and was contingent upon the successful completion of the transaction between Equitable and Associates. This so-called advisory fee, purely discretionary on the part of Associates, is, in the view of the Court, nothing more than an attempt by Associates to cast the transaction as arms length with Groups in an effort to cure the conflict of interest problem.

47. On September 28, 1981, Associates consummated sale of the Property to Equitable. The Olivetti Building was sold for $38 million: $15 million in cash and $23

million by assumption of a portion of the Manufacturers Hanover mortgage. The Hotel Nassau was sold separately for $15 million plus a contingent amount equal to 26.5% of the profits from the future development of the Hotel Nassau site into an office condominium tower. The fixed portion of the purchase price of the Hotel Nassau was paid as follows: $1.1 million in cash and $13.9 million by assumption of the remaining portion of the Manufacturers Hanover mortgage. Thus, the fixed portion of the sales price of the Property was $53 million, $16.1 million of which was paid in cash and $36.9 million by the assumption of Manufacturers Hanover's loan to Associates.

As part of this transaction, Associates assigned to Equitable the Groups lease dated January 1, 1980, as amended. The lease, as amended, covers the ninth, tenth and eleventh floors at an annual rent of $1,304,620 and again made no disclosure of any required security deposit.

48. The Hotel Nassau was demolished and the office condominium tower contemplated by Associates and Equitable was constructed. On January 11, 1983, Charles received a telex from Matthew W. Mayer, a Weil attorney, indicating that Equitable's profit distribution to Associates would be more or less $6.2 million.

49. On January 11, 1983, from Uruguay, Charles telexed instructions to Weil for the distribution of the Equitable payment. Charles wrote: "The amount paid to The Securities Groups is comprised of an $800,000 fee for my services and the return of $1,452,000 rental deposit." Groups ultimately received the $800,000 in advisory fees and the return of $1 million of its rent deposit with interest ($452,000) some sixteen months after Associates sold the Property and assigned the January 1, 1980, lease to Equitable. According to the May 15, 1981, financials, Groups did not receive from Associates the return of the remaining $1.3 million of security deposit referred to in the audited December 31, 1980, financial statements. The remainder of the profits, the telex instructed, were to be distributed to Charles, Orin and Randall Atkins.

50. The issue of a conflict of interest raised by acquisition of the Property by persons or an entity other than Groups was raised during the early negotiations. Charles, Orin and Randall were always aware of the problem. Charles Barnett, knew or should have also known of the conflict and there is sufficient testimony in the record to raise that inference.

In September or October of 1979, Charles raised the issue with Schmidt and referred it to Weil for advice and counsel. Orin raised the issues on December 24 or 25, 1979, advising Charles and Randall to "get an opinion before they did anything" because Charles was the general partner of TSG. Orin felt that "if it was an opportunity to purchase the property which could be taken over by The Securities Group which The Securities Group would have performed, then they would have a conflict." Orin was assured by either Charles or Randall that they had obtained legal advice on the question.

Orin, himself, spoke to an attorney about the conflict of interest problem. Moreover, when Charles and Randall approached Orin in the summer of 1980 to try to persuade him to secure space at 500 Park Avenue for Ashland Oil, after the building had been purchased and tenants were being sought, Orin told them he "had reservations" about involving his own company, Ashland Oil, with a "family enterprise." Orin even suggested that Randall and Charles consult with a director of Ashland, who was also a lawyer, about the conflict problem. The Court concludes, therefore, that the defendants were at all relevant times aware of the conflict problems surrounding their purchase of the Property.

51. There was never any communication between the defendants or plaintiffs (which they controlled or, by law, had a duty to manage) and the limited partners of the plaintiffs setting forth the financial details surrounding the purchase of the Property. Only after the transaction was consummated were the limited partners informed and then only through the information con-

tained in Groups' audited financial statements.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1334.

2. The plaintiffs are New York partnerships involved in Title Eleven bankruptcy cases before this Court. Defendants Charles Agee Atkins, Randall W. Atkins, and Charles D. Barnett were all general or *de facto* general partners of TSG, TMG or Groups. Defendant Orin E. Atkins is a limited partner of TSG, TMG and Associates.

3. Plaintiffs' causes of action are not barred by the applicable six year statute of limitation set forth in N.Y.Civ.Prac.Law § 213 (McKinney 1985).

4. As managing general partners of Groups, TSG, TMG and TSG80, defendants Charles Agee Atkins and Randall W. Atkins owed the partnerships the highest degree of loyalty, fidelity and fair dealing.

■ 5. In purchasing 500 Park Avenue and the Hotel Nassau for themselves, Charles and Randall engaged in a course of conduct which was in direct contravention of their fiduciary obligations to the plaintiff partnerships. As a result, equity will impose a constructive trust in favor of the plaintiffs on all profits derived from the sale of the Property to Equitable.

It is well settled that joint adventurers owe a high degree of fidelity to each other. *Meinhard v. Salmon*, 249 N.Y. 458, 463–464, 164 N.E. 545, 546, 62 A.L. R. 1. The courts have universally agreed that a joint adventurer or partner is prohibited from self-dealing during the pendency of the venture and that profits so realized belong to the venture ... If the activities of the errant partner are in any wise traceable to the business or assets of the venture they will be treated as part of the venture.... This standard of rigid fair-dealing is especially high when the self-dealing party is manager of the enterprise. (Citations omitted).

*In re Kohn's Estate*, 116 N.Y.S.2d 167, 26 Misc.2d 659, *aff'd*, 126 N.Y.S.2d 897, 282 App.Div. 1045 (Surr.N.Y.Co.1952).

■ 6. The purchase of the Property by Charles and Randall for their own interests was also in direct violation of Sections 43 and 98 of the New York Partnership Law, which require that general partners account to the partnership for any benefits or profits derived from any transaction connected with the partnership business or use by them of partnership property for other than partnership purposes.

Specifically, their use of the plaintiffs' credit and over $5,000,000 of plaintiffs' funds (the "security deposits") in order to finance the purchase of the Property was in direct violation of Section 98(1)(d) of the New York Partnership Law, which prohibits the general partners of a limited partnership from possessing or using partnership property for other than partnership purposes. *See Materson v. Valley National Bank of Long Island*, 334 N.Y.S.2d 356, 70 Misc.2d 623 (Sup. Nassau Co.1979) (general partner may not pledge the credit or assets of the partnership for his personal obligations without the consent of the other partners).

7. As managers of the Partnership and general partners, defendants Charles and Randall are held to a stricter standard of fiduciary responsibility towards the limited partners, which standard was breached by their self-dealing in partnership opportunities and their misappropriation of partnership property for their personal gain.

8. Even aside from the fiduciary relationship created by the partnership status of the parties, Charles' and Randall's use of over $5,000,000 of Groups' funds in the acquisition and improvement of the Property requires the imposition of a constructive trust at equity on all profits resulting from the use of such funds.

The general rule is that a constructive trust will be declared and enforced as a remedy against an unjust enrichment by reason of the wrongful or fraudulent use of the property or money of another in the acquisition or improvement of property, whether the relationship of the par-

ties in question at the time of the misapplication is or is not fiduciary or confidential and whether the misapplication of property or funds is simultaneous with or after the making of the acquisition or improvement, so long as the property or money can be identified and does not come into the hands of a bona fide purchaser for value and in good faith. This rule of a constructive trust has been variously applied to a fraudulent purchase in his own name by a fiduciary with funds of an estate entrusted to him, a wrongful investment in his own name by an agent to invest, a fraudulent and wrongful purchase by a corporate officer with corporate funds, a wrongful or fraudulent use by an employee of the funds of his employer in the acquisition or improvement of property of the employee, and the purchase or improvement of property by one with the funds of a stranger. It has been applied in husband and wife, parent and child, and partnership cases.

76 Am.Jur.2d *Trusts* § 249. *See also, 319 East 72nd Street Corp. v. Warneckes*, 20 A.D.2d 513, 244 N.Y.S.2d 604 (1st Dept. 1963).

9. As a result of their misappropriation of partnership opportunities and property and their breach of New York Partnership law, defendants Charles and Randall are liable to the plaintiffs in conversion for compensatory damages and for profits resulting from the resale of the Property. *See Newburger, Loeb & Co., Inc.*, 563 F.2d 1057 (2nd Cir.1977); *McCoy v. American Express Co.*, 253 N.Y. 477, 482, 171 N.E. 749 (1930). *See also, Brown v. Bullock*, 194 F.Supp. 207, 229 (D.S.D.N.Y.1961) *aff'd*, 294 F.2d 415 (2d Cir.1961) ("[W]illful misapplication of corporate funds by fiduciaries constitutes conversion. That the misapplication occurred under guise of a contract or was approved by directors who themselves wrongfully and knowingly participated in the transaction is immaterial.").

10. Defendant Charles Barnett is also liable in this action by virtue of his position as a general partner of TSG and by virtue of his active participation in the acquisition of the Property. It is immaterial that he may have been unaware of certain portions of the transaction. Partnership liability, like respondeat superior, is based on agency principles. Neither doctrine requires participation in nor knowledge of the acts performed before liability may be imposed. *Northwestern National Bank of Minneapolis v. Fox & Co.*, 102 F.R.D. 507, 512 (D.S.D.N.Y.1984).

Furthermore, New York case law is abundantly clear that the actions of one partner need not be actually within the scope of the partnership's business to be binding on the other partners, so long as it is apparently within the scope of the partnership's business. *Bank of Commerce v. DeSantis*, 451 N.Y.S.2d 974, 114 Misc.2d 491 (N.Y.City Civ.Ct.1982). *See also, Riley v. Larocque*, 297 N.Y.S. 756, 163 Misc. 423 (1937) ("Even a professional partnership will be responsible if partners participated in the wrongdoing, or closed their eyes to a fraud being perpetrated by one of them, where if the conduct, whether by acts or omissions, were such as to bind them with the mark of bad faith.").

11. The Court also finds that defendants Charles, Randall and Barnett have violated the Corporate Opportunity Doctrine. That doctrine holds that an individual officer/director of a corporation (or partnership) owes a fiduciary duty of loyalty to a corporation. That duty forbids him to pursue his own personal interest in a manner which may harm the corporation. *See Lichtyger v. Franchard Corp.*, 18 N.Y.2d 528, 277 N.Y.S.2d 377 (1966) (applying the corporate opportunity doctrine to partnerships). The rule also prohibits a corporate executive from appropriating to himself, and others associated with him, a business opportunity which in fairness should belong to his employer.

Should a corporate officer acquire for himself or herself property in which the corporation had a "tangible expectancy," the corporation may insist that the title was acquired for its benefit and may require the fiduciary to transfer the property or profits back to the corporation. *In re Gordon Car & Truck Rental, Inc.*, 65 B.R.

371 (Bkrptcy.N.D.N.Y.1986); *Burg v. Horn*, 380 F.2d 897, 899 (2d Cir.1967) (applying New York law); *Blaustein v. Pan American Petroleum and Transport Co.*, 293 N.Y. 281, 304, 56 N.E.2d 705 (1944). *See generally*, 74 Harv.L.R. 765 (1961).

■ Relevant judicial considerations for determining when a corporation or partnership has a tangible expectancy in a particular opportunity include: (1) whether or not the entity is financially able to undertake the opportunity; (2) whether such opportunity is reasonably in the "line" of the entity's business; (3) whether the opportunity is of practical advantage to it; and (4) the likelihood of realization from the opportunity.

The "financial ability" factor noted above is apparently of no consequence in New York. In *Foley v. D'A'Gostino*, 21 A.D.2d 60, 248 N.Y.S.2d 121 (1st Dept.1964), the Court stated:

> The rejection by the corporations of the opportunity of taking over the rival and competing business would not release the defendants, as long as they remained in office and were in the employment of the corporations, from their continuing and overriding obligation of loyalty and good faith to the corporations ... The rule is well stated in 54 Harv.L.Rev., supra, 1191, 1199, where it is said that " * * * the fact that the competing business undertaken presented itself in the form of a corporate opportunity which the corporation was financially unable or for other reasons unwilling to undertake should be no excuse for an officer undertaking it individually. Despite the corporation's inability or refusal to act it is entitled to the officer's undivided loyalty. If the two are competitive, the corporation, while not entitled to a general freedom from competition, is entitled to freedom from competition by those charged with the promotion of its interests."

■ Here, the partnerships were fully capable of performing and did in fact provide all of the financial resources needed by defendants in connection with the purchase of the Property. They provided nearly all the financial means but received none of the profits. The Court finds, therefore, that the plaintiffs had the financial ability to undertake the transaction.

The second consideration involves the "interest or expectancy" factor, which precludes the acquisition of a business opportunity by corporate officers where the corporation has established an interest growing out of the corporation's initial relationship to the opportunity. *See, Abbot, Redmont, Finlight Corp. v. Redmont*, 457 F.2d 85 (2d Cir.1973). It would appear under New York law that a rigid "line of business" test would not be appropriate, but rather, the opportunity which is the subject of any particular case must be determined on particular circumstances presented in each case.

Here, the plaintiffs clearly had an "established interest" in the Property arising out of their "initial relationships to the opportunity." Though the principal business of Groups was trading government securities, it was specifically authorized to engage in other investment related activities.

The Court finds further that the plaintiffs clearly had an "established interest" in the property that they were to occupy as a sole office of operations and for which they had supplied sums in excess of $5,000,000 to purchase. The evidence presented at trial conclusively establishes that the initial negotiations for the Property were done on behalf of TSG and Groups, thus providing an "initial relationship to the opportunity." Accordingly, both the "established interest" and "initial relationship" tests are met.

In this case, the likelihood of realization from the opportunity was particularly high. The plaintiffs were in dire need of new office space and were looking to either buy or lease new facilities. Indeed, the evidence indicates that the initial negotiations relating to the purchase of the Property were made by Groups. It was not until Charles and Randall realized the amount of money that could be made in this transaction that they undertook the task themselves (albeit with Groups' money). The Court concludes, therefore, that had this

opportunity been properly presented to the plaintiffs, the partnerships would have certainly undertaken the project.

12. It has been said that the Corporate Opportunity Doctrine is a rule of disclosure requiring the fiduciary to pass along information to his or her corporation or partnership whenever a profitable opportunity presents itself. *E.g., In re Gordon Car & Truck Rental, Inc.,* 65 B.R. 371 (Bkrptcy. N.D.N.Y.1986). Here, neither Charles, Randall, nor Barnett made any attempt to bring this opportunity to the partnerships or to alert the other investors of the profits which could be made.

13. The defendants have argued that they had no obligation to present a speculative real estate venture to the plaintiffs and that the partnership agreements themselves specifically gave them the right to engage in other business opportunities. For instance, paragraph 3.07 of the limited partnership agreement for TSG provides:

> The general partners may engage in other business activities and shall not be required to refrain from any other activity or disgorge to the Partnership or any Limited Partner any profits from any such activity, whether as a general partner of additional partnerships for investment in similar securities on the same exchanges and whether the same be competitive with The Partnership.

The Court recognizes the right of the general partners to engage in other business but finds the "boilerplate" language contained in the partnership agreements insufficient to overcome the fiduciary responsibilities imposed upon them by law. Having acted to the detriment of the plaintiffs and having used partnership funds to acquire the building, the defendants remain liable for breach of their fiduciary responsibilities.

14. Under the adverse acquisition doctrine, which prohibits a general partner from taking any position inconsistent with the partnerships business, defendants Charles, Randall and Barnett are liable to the partnerships due to their having purchased the Property for their individual accounts. As a result, the defendants are liable to the partnerships for profits on the resale of the Property to Equitable Life Assurance Society. *See, Lavin v. Ehrlich,* 80 Misc.2d 247, 363 N.Y.S.2d 50 (Sup. Nassau Co.1974) (Acquiring title or interest adverse to firm calls for imposition of a constructive trust.).

15. Though a higher duty is owed to the partnership by the general partners, limited partners who act in concert with general or managing partners in a breach of fiduciary duties are also held to be accountable to the partnership and the remaining limited partners. *See, e.g., May v. Flowers,* 106 A.D.2d 873, 483 N.Y.S.2d 551 (4th Dept.1984).

The plaintiffs in this case seek to impose such liability on Orin E. Atkins, a limited partner in TSG, TMG and Associates (after March 1980). They claim that Orin E. Atkins' act of guaranteeing "a couple of million dollars" of Associates' obligations and his participation in the acquisition of the Property constitute sufficient ground for setting aside his limited liability position. The Court does not agree.

Section 96 of the New York Partnership Law states:

> A limited partner shall not become liable as a general partner unless, in addition to the exercise of his rights and powers as a limited partner, he takes control of the business....

Although this statute has not been precisely interpreted under New York law, other states have held that the key question for determining when a limited partner becomes liable as a general partner is the degree of "control" that the limited partner has in the day-to-day function and the operations of the business. *Dwinnell's Central Neon v. Cosmopolitan Chinook Hotel,* 21 Wash.App. 929, 587 P.2d 191 (1978). Here, the plaintiffs have not demonstrated that Orin had any "control" over the management of the partnership. At most, plaintiffs have only demonstrated that Orin was consulted on a few occasions regarding general partnership matters. The Court does not find this participation to be

**218**

of sufficient magnitude to hold Orin liable as a general partner.

Similarly, the fact that Orin guaranteed a portion of Associates' obligations does not make him liable as a general partner. He has simply guaranteed certain obligations of the partnership without undertaking to manage the partnership's day-to-day affairs. Furthermore, there is no indication that Orin held himself out as a general partner or that anyone was misled to believe he was a general partner.

It is worth noting that the Revised Uniform Limited Partnership Act, §§ 101–1106, 6 U.L.A. 205 (1985 & Supp.1987) (not yet adopted in New York) specifically authorizes a limited partner to guarantee partnership obligations and to consult with the general partners on any matter without incurring unlimited liability. These "safe-harbor" provisions were added to clear up the uncertainty surrounding participation in the partnership business by codifying those rights thought to exist under earlier versions of the act. *See*, Thames, *Understanding Florida's New Limited Partnership Act*, 11 Nova L.Rev. 1405, 1414–1417 (Summer 1987). The Court mentions this fact merely to support its conclusion that Orin has done no act which would justify the imposition of general partner liability upon him.

16. It is no defense to this adversary proceeding that the proposed real estate transaction was outside the scope of the partnerships' business as the defendants are still guilty of misappropriating partnership property.

■ 17. Under the broad powers conferred on the general partners by the partnership agreements and § 12(3) of the New York Partnership Law (permitting a partnership to own "any estate in real property), the purchase of the Olivetti Building and the adjacent Hotel Nassau by the partnership would not have been *ultra vires*.

It is generally understood that a partnership may acquire such facilities and property as are necessary to facilitate the day-to-day operations of the partnership. In this case, Section 1.03(b)(vi) of The Securities Groups Partnership Agreement specifically states that one of the "objects and purposes" of the Partnership is "to maintain one or more offices within or without the State of New York, and in connection therewith to rent or *acquire* office space, engage in personnel and do such other acts as may be advisable or necessary in connection with such offices and personnel." (Emphasis added). Although this could be interpreted to limit the partnerships' ability to acquire real estate to that amount of space reasonably necessary for the continued operations of the business, the Court does not feel compelled to reach such a conclusion.

The defendants were unable to produce any evidence that the partnership agreements prohibited them from investing in real estate. The agreements instead authorized the partnerships to "engage in any and all business activities as may be permitted by law including but not limited to ... investment related activities." The Court is willing to give this a broad interpretation so as to encompass the transactions at bar.

Defendants' other argument that the purchase of the Property was a risky real estate venture not contemplated by the investors is also rejected. The defendants still owed the partnerships a duty of loyalty and were precluded as a matter of law from usurping a "corporate" opportunity or misappropriating partnership funds.

■ 18. Plaintiffs' complaint also raises questions regarding violations of the Racketeer Influenced and Corrupt Organizations Act, supra. More specifically, the complaints seek to impose RICO liability on the defendants for diversion of partnership opportunity and breach of fiduciary duty. However, after careful consideration of the issue, the Court concludes that the plaintiffs failed to allege or prove the necessary elements to support a RICO claim.

The claim asserted here was first raised on behalf of these same plaintiffs in an action pending in the United States District Court for the Southern District of New York entitled *McMullen v. Atkins, et al.*, 83 Civ. 5844 (VLB) (D–83). It was copied

virtually verbatim from the Consolidated Second Amended Complaint filed in *McMullen* in September 1985.

The single claim in the complaint relates to a single episode: the purchase and sale of the Olivetti Building and the adjacent Hotel Nassau property. No other business was alleged and none other was proven. This was not the open-ended, on-going criminal enterprise against which RICO was directed.

One of the essential elements that a plaintiff must allege and prove in order to sustain a claim under RICO is conduct which constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1962. *Sedima, S.P.R.L. v. Imrex Company, Inc.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). A pattern of racketeering activity within the meaning of § 1963 "requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5). Even then, this may not be enough:

> [t]he implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern.

473 U.S. at 496, n. 14, 105 S.Ct. at 3285, n. 14.

The legislative history accompanying the RICO statute does indeed support the conclusion reached in *Sedima* and in this case. For example, a Senate Report states:

> The concept of "pattern" is essential to the operation of the statute. One isolated "racketeering activity" was thought insufficient to trigger remedies provided under the proposed chapter, largely because the net would be too large and the remedies disproportionate to the gravity of the offense. The target of title IX is thus not sporadic activity. The infiltration of legitimate business normally requires more than one "racketeering activity" and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which com-

> bine to produce a pattern. (Emphasis added)

S.Rep. No. 91–617, 91st Cong., 2nd Sess. (1969), at p. 158.

This "continuity plus relationship" test was specifically recognized by the United States Supreme Court in *Sedima*. 473 U.S. at 496, n. 14, 105 S.Ct. at 3285, n. 14. The Court is compelled therefore to apply the test to the instant action.

In this case, the injury occurred on a single day, and the alleged predicate acts of fraud all relate to a single transaction. No other business activity of Associates was involved. Moreover, no threat of future "racketeering" activity was shown. The plaintiffs therefore have failed to prove the requisite element of continuity. They have failed, in the words of Judge Leval in *Proctor & Gamble Co. v. Big Apple Industrial Buildings, Inc.*, 655 F.Supp. 1179, 1183 (S.D.N.Y.1987), "to convert a lawful enterprise into a RICO entity." Their complaint as it relates to violations of RICO must therefore be dismissed.

19. Having found that defendants Charles, Randall and Barnett are guilty of conversion, unauthorized use of partnership funds for non-partnership purposes, usurping a partnership opportunity and of violating their fiduciary responsibilities to the partnerships, the appropriate remedy in the instant case is to impose a constructive trust on all gains received by the defendants from the resale of the Property. *Riviera Congress Associates v. Yassky*, 18 N.Y.2d 540, 277 N.Y.S.2d 386, 223 N.E.2d 876 (1966); *319 East 72nd Street Corp. v. Warneck*, 20 A.D.2d 513, 244 N.Y.S.2d 604 (1st Dept.1963); *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1 91928); *Wendt v. Fisher*, 243 N.Y. 439, 154 N.E. 303 (1926).

From the evidence presented, the Court calculates plaintiffs' damages as follows:

Proceeds of the sale of the Properties (including financing up to the amount of the purchase price, but not including the $12.6 million excess financing used by defendants for other purposes).... $53,000,000

| | |
|---|---|
| Profits distributed by Equitable Life Assurance Society to defendants subsequent to sale in 1983 | $ 6,187,000 |
| Unreturned "security deposit" belonging to the Partnerships | $ 1,300,000 |
| | $60,487,000 |

Less: Acquisition cost of Properties (Including Kalikow's interest) ($25,500,000)
Cost of Demolishing the Hotel Nassau ($ 377,400)
Cost of Relocating existing tenants in the Hotel ($ 382,500)
Returned security deposit ($ 1,452,000)
Consulting fee paid to Plaintiffs ($ 800,000)
DAMAGES.................... $31,975,100

Plaintiffs are thus entitled to a judgment for damages against Charles Agee Atkins, Orin E. Atkins, Randall W. Atkins, Charles D. Barnett, and 500 Park Avenue Associates in the amount of $31,975,100.[1] The Court will dismiss the complaints as they relate to defendant Orin E. Atkins.

The Court will enter a separate Final Judgment in accordance with these findings.

---

**1.** The Court refrains from expressing an opinion as to the effect, if any, a bankruptcy discharge awarded Charles Agee Atkins will have on this judgment.