Benjamin J. Rabin, J.
This is an action for an accounting with respect to an alleged joint venture between the parties.
Some time in January, 1945, the plaintiff Charles Hasday, acting for himself, the plaintiff Bardavid, and his brother Mordu, then in the business of manufacturing house dresses as partners under the name of Dixie Dress Co. (hereinafter referred to as “ Dixie”), and the defendant Morris Barocas, acting for the defendants, then separately engaged in the manufacture of house dresses, purchased the controlling interest in Mansfield Mills (hereinafter referred to as “ Mansfield ”), a North Carolina plant for the manufacture of textiles. The parties purchased approximately 5,800 shares of the capital stock of Mansfield. Morris Barocas and his group paid for two thirds of the said shares and took title in his name and in the name of the defendant Victor Barocas, his brother; Dixie paid one third for the balance of the stock taken in the name of Charles Hasday. The parties, being themselves engaged in businesses which could profitably use the textile output of Mansfield during the war years when shortages obtained, agreed to exploit their control of Mansfield so that the Barocas group would receive two thirds of the ‘ ‘ free goods ’ ’ produced by Mansfield and Dixie one third. In connection with the meaning of ‘ ‘ free goods ’ ’ it might be well to mention here that at the time the parties entered into their arrangements the goods that were manufactured by Mansfield were subject to government controls. Mansfield could not sell its product to whomever it wanted to sell. The distribution *24 of its merchandise was subject to allocation by government control and, except for 15%, could only be sold to those holding priority orders approved by the government. As to the 15%, Mansfield could dispose of it to whomever it chose. That 15% was known as “ free goods ” as distinguished from the other merchandise which was subject to priority orders. There is some dispute between the parties with respect to the meaning of “free goods ” as used in connection with their agreement. That will be considered in greater detail later.
In addition to the arrangement with respect to Mansfield the parties formed a copartnership under the firm name and style of Textile Converting Company (hereinafter referred to as “Textile”) which was appointed the selling agent for the entire output of Mansfield. Textile was operated nominally in the name of the defendant Isaac Barocas, another brother of Morris Barocas, and the plaintiff Joseph Hasday, the son of Charles Hasday; the controlling party of Textile was Morris Barocas. At first the profits in Textile were to be divided according to the stock interests of the parties in Mansfield but this method of division was subsequently temporarily changed.
By agreement dated March 21, 1946, Charles Hasday, and Morris and Victor Barocas entered into a written stockholders’ agreement restricting the outside sale of the Mansfield stock held by them respectively. And by letter of the same date to Charles Hasday from Morris and Victor Barocas, ‘ ‘ our oral understanding ” was confirmed that so long as the parties remain stockholders in Mansfield or receiye “ free goods ” they were to receive such goods in the two-to-one ratio hereinabove referred to. The latter agreement was expressly stated to be for the period commencing March 21, 1946, and ending March 21,1947.
Office of Price Administration price controls and ceilings ended on November 9, 1946; War Production Board controls and priorities ended on January 14, 1947. And so after these dates none of the output of Mansfield was subject to allocation or priority orders. In September, 1947, apparently to insure the plaintiffs further that they would receive their agreed-upon share of the Mansfield output, the Lowell Textile Company (hereinafter referred to as “ Lowell ”) was organized. Lowell, Dixie and Barocas’ group agreed that Lowell could purchase whatever it wished of the Mansfield production. Fifty percent of the goods purchased by Lowell was to be available to Barocas’ group and Dixie, two thirds and one third respectively. Charles Hasday had control of Lowell. In October, 1949, the *25 mill of Mansfield was sold and the activities of Mansfield, Textile and Lowell, here of interest, terminated.
The plaintiffs’ suit for an accounting has two main bases: (1) that the arrangement of the parties with respect to Mansfield was in the nature of a joint venture; that a fiduciary-relationship existed between them with respect to the “ free goods ” to be distributed and that there was a breach of that relationship by the defendants in that the plaintiffs did not receive one third of the “ free goods ” of Mansfield while the defendants received, through various dummy corporations, far more than two thirds of that output; and (2) that the defendants so controlled and operated Textile as to violate the fiduciary obligation owing thereunder by one partner to another.
So far as the sharing of Mansfield’s “free goods” is concerned, the defendants deny the existence of any joint venture with respect to Mansfield and further deny that they have breached any obligation — fiduciary or contractual — which they might owe the plaintiffs. In addition various affirmative defenses were asserted by the defendants: the agreement to control the output of Mansfield is said to be illegal and contrary to public policy; the absence of Mordu Hasday as a party plaintiff is alleged to constitute a fatal defect in that he was a partner in Dixie until May, 1946, when he was replaced by the plaintiff Joseph Hasday as a partner; it is urged that the alleged original oral agreement for a joint venture with respect to Mansfield was merged in and superseded by the above-described letter of March 21,1946, which limited to one year the arrangement with respect to the ‘ ‘ free goods ’ ’; and as a further defense it is asserted that with respect to that portion of the alleged joint venture not comprehended within the written letter of March 21,1946, the Statute of Frauds is a bar.
I find it unnecessary to consider in detail all of these defenses. For in my opinion the plaintiffs have failed to prove the existence of a joint venture as to the respective interests of the parties in Mansfield and have further failed to show that they were deprived of the share of the “free goods” promised to them.
Ordinarily the party injured by a breach of an obligation imposed by law or contract is entitled to damages correlative with and compensatory for the loss suffered. The gain of the breaching party resulting from the breach is immaterial. But where the complaint is that the property of one, rendered accessible to another as a consequence of a trust or confidence lodged in that other, has been appropriated and used by the *26 latter to his profit, then the wrongdoer may be held to account fully to his victim therefor. The agent or fiduciary entrusted with the property rights or interests of others may be thus held accountable through the medium of a constructive trust (Beatty v. Guggenheim Exploration Co., 225 N. Y. 380; Meinhard v. Salmon, 249 N. Y. 458); the express trustee, of course, is bound by his trust and must account for the proceeds realized by him from his improper appropriation to his own use of trust property (2 Scott on Trusts [1st ed.], § 202, p. 1093); indeed, the liability in equity for the use of the property of another comprehends the gains realized by the converter of property from his use thereof (Newton v. Porter, 69 N. Y. 133). This principle does not end with the appropriation of property belonging solely to another. It extends as well to the case where the malefactor has an interest in the property. Partners are thus obliged to account to each other; and each is responsible to the other for the fruits of wrongfully appropriated partnership property. (Partnership Law, § 43, subd. 1.) And where parties pool resources or services without forming a partnership, and each is allowed access to and to deal with their commingled property and interests as an associate, and not at arm’s length, thereby creating a “ joint venture ”, again each party is accountable for his use of the property of the other thus contributed to the enterprise (Meinhard v. Salmon, supra; May v. Hettrick Bros. Co., 181 App. Div. 3, affd. 226 N. Y. 580; Brown v. Leach, 189 App. Div. 158).
But “ a mere community of interest ” (Porter v. McClure & Tourtellot, 15 Wend. 187, 192) is not sufficient to give rise to a joint venture. The fact that two parties agree to purchase materials from a single source does not entail that joint use or risk or amalgam of property and interests adequate to constitute the “ limited partnership ” (Haxton & Son v. Rich, 267 App. Div. 492, 495), which is a joint venture. In Columbian Laundry v. Hencken (203 App. Div. 140,143-144) it was said:
“ The property purchased was to be owned in severalty not jointly. There was to be no sharing of profits or losses. If the trucks received by defendant were thereafter sold by him for a greater price than the sum he contributed therefor, the plaintiff had no interest in such profits and would have no cause of action against defendant. If plaintiff sold his share of the property purchased at a loss, he could not call on defendant to contribute to such loss. Thus the underlying elements of a partnership or joint adventure are lacking.
*27 “In Reynolds v. Searle (186 App. Div. 202) the court said: (at p. 203): ' An indispensable essential of a contract of copartnership, either under the common-law rule or the statute, is a mutual promise or undertaking of the parties to share in the profits of the business and submit to the burden of making good the losses.’
‘ ‘ At common law it has always been held that to constitute a partnership or joint adventure, there must be an agreement to share in the profits and losses.
“ It was held in Chase v. Barrett (4 Paige, 148) that1 to constitute a partnership as between the parties thereto, there must be a joint ownership of the partnership funds, and an agreement, either express or implied, to participate in the profits or loss of the business. ’
“ The complaint in this action distinctly negatived the idea of a joint interest in the profits or losses, as each of the parties was to own the specifically described articles which each needed and for which a specified sum was to be paid. * * *
" Even if the plaintiff had jointly purchased the articles in question with defendant, and had not agreed as to what they would do with them, that would not have constituted a partnership between the parties. It was so held by the Court of Appeals in the case of Baldwin v. Burrows (47 N. Y. 199) where the court says (at p. 206): ‘ there was no agreement as to the sale or disposition of the property, but that that subject was left for future consideration. To constitute a partnership there must be a reciprocal agreement of the parties not only to unite their stock, but to share in the risks of profit or loss by the disposition to be made of it. Where several parties agree to purchase personal property in the name of one of them, and to take aliquot shares of the purchase without agreeing to resell jointly, there is no partnership. (Hoare v. Dawes, 1 Doug. 371; Coope v. Eyre, 1 H.Bl. 37; Holmes v. United Ins. Co., 2 Johns. Cases, [329], 331; Post v. Kimberly, 9 Johns. [470] 491.) ’ ”
And it has otherwise been held that even where the parties agree to distribute upon a percentage basis the proceeds of an enterprise, no joint venture is present if that enterprise does not represent a joinder of property, skills, and risks. (Gordon Co. v. Garcia Sugars Corp., 241 App. Div. 155; Byrne v. Blaker Adv. Agency, 239 App. Div. 395.) Similarly, while the sharing of losses is a significant indicia that the parties have joined (Bialostok v. A. & M. Knitting Mills, 272 App. Div. 936; Alpert v. Sebo, 269 App. Div. 433; Jasper v. Bernstein, 259 App. Div. 638) that element too is not the exclusive consideration (Mariani v. Sum *28 mers, 3 Misc 2d 534, affd. 269 App. Div. 840; Usdan v. Rosenblatt, 93 N. Y. S. 2d 862). The ultimate inquiry is whether the parties have so joined their property, interests, skills and risks that for the purpose of the particular adventure their respective contributions have become as one and the commingled property and interests of the parties have thereby been made subject to each of the associates on the trust and inducement that each would act for their joint benefit; in such event an appropriation is the appropriation of another’s entrusted property for which an accounting is in order. “ [T]he right to an equity accounting * * * is recognized only when a trust has been reposed in the defendant with respect to moneys or other property in his possession; that is, when he has been ‘ intrusted with property of the plaintiff and, in consequence, to have become bound to reveal his dealings with it.’ (Schantz v. Oakman, 163 N. Y. 148, 156, 157.) ” (Hermes v. Compton, 260 App. Div. 507, 509.)
The strongest version of plaintiffs’ position — ■ which, incidentally, is not supported by the evidence — is that the parties purchased the mill so that each could get an agreed-upon share of its available produce. I put aside the fact that the stock of each group was purchased separately; that the stock was originally purchased for investment purposes; and that there intervenes the corporate entity of Mansfield. Yet, even on the plaintiff’s presentation I find no amalgam of property or interests sufficient to create a joint venture. For whatever may have been the nature of the interest of the parties in Mansfield, there was no commingling by them of their interests in the produce of Mansfield, the subject matter of the accounting sought by plaintiffs. To the contrary, each of the parties contemplated the separate and several receipt of a distinct percentage of the “ free goods ” of Mansfield. (Cf. Gordon Co. v. Garcia Sugars Corp., 241 App. Div. 155, supra.) There was no joint use of that produce contemplated, or any joinder of hopes of profit or risks of loss. At most, the parties had interests in common which were to be furthered by certain mutual action. But it is this mutual course of conduct which the plaintiffs mistake for a joint venture. It is not enough that two parties have agreed together to act in concert to achieve some stated economic objective. Such agreement, by itself, creates no more than a contractual obligation, otherwise every stockholders’ agreement would give rise to a joint venture. The fiduciary obligation arises upon the coagulation of property, profits or other interests which the parties can then be said to hold jointly and which are made accessible to each other in *29 terms of the confidential relationship which exists between joint associates. Only then can it be deemed that the charged party has converted or otherwise improperly used the property of another and thereby rendered himself accountable for the gain and profits he has enjoyed.
Apart from a joint venture, the plaintiffs have attempted to impose upon the defendants some fiduciary obligation with respect to the distribution of the “ free goods ” produced by Mansfield by the contention that Morris Barocas had control over Mansfield and the distribution of its “ free goods Even if it be assumed that such control would impose a fiduciary obligation, I find the facts to be inconsistent with the claimed control.
The defendants were not in sole and exclusive control of the Mansfield Corporation. Both the plaintiff Hasday and the defendant Barocas had representation on the board of directors. In fact the plaintiff had three representatives on the board to the defendants’ two. Besides, there were outside interests on the board representing the stock which the parties did not control. The parties had merely purchased 51% of the stock of the corporation. The plaintiff Hasday attended all of the board meetings and knew or was in a position to know and therefore should have known exactly what Mansfield was doing with respect to the distribution of goods. The general manager of the plant was a man by the name of Hartley. It is conceded that the original instructions to Hartley with respect to distribution wore given jointly by Hasday and Barocas and I also find that from time to time instructions were given to Hartley not only by Barocas but also by Hasday. I find further that Hasday was kept informed by weekly statements issued by Hartley with respect to the manner in which the output of Mansfield was distributed and particularly with respect to the amount of "free goods ” available for distribution. I therefore find on the facts that there was no greater control of the corporation or of its merchandise distribution by the defendant Barocas than there was by the plaintiff Hasday and I so find despite the fact that Barocas had a greater stock interest in that corporation.
I further find that even if it were to be assumed that the parties entered into a joint venture with respect to Mansfield, the plaintiffs have not established any right to an accounting by the defendants. For the evidence shows that the plaintiffs got as much of the one third of the “ free ” and other goods as they asked for and were able to use.
*30 The parties are not in agreement as to the meaning of “ free goods ”. The defendants assert that “ free goods ” means only-such goods as during the period of government control were free from priorities and not subject to allocation. The plaintiffs contend that while that may have been true during the period when the government controlled distribution, still after the lifting of such controls, namely, in January of 1947, all goods became free within the meaning of the agreement between the parties. I am inclined to agree with the version of the defendants but still in view of the fact that I find for the reasons hereinafter set forth that the plaintiffs did get all of the merchandise of any nature that they wanted to accept, the difference with respect to the construction to be given to the words ‘ ‘ free goods ” becomes academic.
I am convinced from all of the evidence and from an examination of all of the documents that the plaintiffs did receive all of the merchandise that they wanted to accept. Admittedly during the year 1945 the plaintiffs received their fair share of the merchandise distributed by Mansfield. The testimony of the plaintiff Hasday was to the effect that after the formation of Lowell in September, 1947, no order which he made for Lowell was refused. Hasday had full control of Lowell and he was in charge of the distribution of Lowell’s merchandise. In fact I find that he cancelled orders that Lowell placed during the period after September, 1947, and that goods which were cancelled by Lowell were resold at a deficit which deficit was made good by Lowell. So there remains the period of 1946 and 1947, which is the only period that could give rise to any complaint on the part of the plaintiff with respect to the plaintiffs not receiving their proper share of the merchandise. I find from the evidence that except for one complaint made by Hasday in 1945, the year in which he admittedly received his proper share of the merchandise, there were no other complaints made by him with respect to the allocation between the parties except just prior to the formation of Lowell. I find likewise that even at that time there was no justification for a complaint by the plaintiff but that Lowell was organized to give him further assurance that there would be no cause for complaint.
During the entire period regular reports were submitted to Hasday with respect to the distribution by Mansfield. For many weeks reports showed an excess of production over orders. During 1946 the plaintiffs received slightly in excess of their share of ‘ ‘ free goods ’ ’ and while the defendants did receive over all more than two thirds of the total merchandise shipped to the *31 parties, the difference consisted of merchandise shipped under priority orders to defendants and of a greater than the two-thirds percentage of returns from customers and goods that were known as “ shorts ”. I find that during the years 1946 and 1947 the plaintiffs, although given opportunities to receive merchandise that was returned from customers of Mansfield, refused to purchase such merchandise although in many instances the defendants did accept such merchandise for their accounts. The figures submitted indicate that the defendant Barocas and the corporations, which for the purpose of this trial were concededly controlled by Barocas, received considerably in excess of two thirds of the total merchandise shipped to the parties. But that became possible for the reasons given above, i.e., either the plaintiffs did not order merchandise when they could have ordered it or they refused to purchase when requested to buy or they returned merchandise which they did buy.
One of the reasons that may account for the plaintiffs’ failure to buy in the proportion that they claimed they had a right to was because after controls were lifted Mansfield no longer sold finished goods but limited its sales to goods known as gray goods, that is, unfinished goods. In order to put them to use it would be necessary to process these goods. That required more capital and it also required that the capital be tied up for a great length of time. The plaintiffs were in no position to do such financing and the testimony indicates that plaintiff Hasday stated to the defendant Barocas that he could only buy larger quantities if the defendant financed the processing of the goods.
Another reason for plaintiffs’ failure to buy all they had a right to buy is that throughout the period of the parties’ relationship these goods were not always in demand. There were periods of price slack when perhaps it was to a buyer’s interest either to be more selective or to buy elsewhere. Often the supply was greater than the demand and, during those periods, to buy in excess of what one could actually use would amount to speculating. In fact there was such speculation by the plaintiffs to the extent of 4,000,000 yards with a resulting substantial loss.
Assuming as argued by plaintiffs that “ free goods ” included all goods that were sold in the normal market after the ending of O. P. A. and W. P. B. controls, nevertheless I find that plaintiffs received or could have received all that they claimed to be entitled to under their agreement. Accepting plaintiffs’ own version then, after the lifting of controls plaintiffs would have *32 been entitled to one third of all the merchandise produced by the mill. Plaintiff Hasday testified that after" controls he knew the mill was producing 1 million yards a month or 12 million yards a year, which on his own claim would entitle him to receive one third or 4 million yards a year. With" this knowledge how can he be heard to say that he did not know what was going on or what he was entitled to because defendants were in control. The only possible conclusion that can be reached is that plaintiffs knew that the merchandise was available to them but for one reason or another they did not want it.
With respect to the Mansfield transaction I conclude (1) that there was no joint venture; (2) that there was no fiduciary relationship established between the plaintiffs and the defendants with respect to the Mansfield arrangement in that the plaintiff had as much control of the affairs of Mansfield as the defendants and had as much knowledge of the conduct of its affairs as the defendants, and finally that the plaintiffs did receive all of the merchandise that they wished to receive and there was no breach of the arrangement with respect to distribution of such merchandise on the part of the defendants. The plaintiffs are, therefore, not entitled to any accounting with respect to Mansfield.
With respect to the accounting sought for the alleged violations by defendants of the fiduciary obligations incurred by them in the operation of Textile, it is unnecessary to pass upon the existence or nonexistence of any such breaches. The defendants have had effective and almost complete control of the affairs of Textile, of its books and of its accounts. The plaintiffs have sought but have not received an accounting by the defendants. In the circumstances I believe an accounting is warranted pursuant to the provisions of section 44 of the Partnership Law. As a matter of fact the defendants at page 39 of their trial memorandum indicate that there should be an accounting as to Textile, although they now have a different view. Defendants also took the position that as to Textile the accounting would be a very simple matter. The defendants should account to the plaintiffs in the manner provided for by paragraphs 10a and 13 of the partnership agreement of the parties.
In the light of the determinations made above there need be no accounting, however, to reflect whether the plaintiffs got a fair share of the merchandise distributed by Textile pursuant to the arrangements between the parties.
*33 Upon the filing of such account the plaintiffs may file objections pursuant to the provisions of the Partnership Law and particularly but not exclusively with reference to such matters as are referred to under subdivision 1 of section 43 of the Partnership Law.
Accordingly judgment will be entered in favor of defendants and against plaintiffs with respect to all matters affecting Mansfield and in favor of the plaintiffs for an account as above set forth with respect to the affairs of Textile. All motions on which decision was reserved in the course of the trial are denied, except those with respect to judgment and those are granted which are not inconsistent with this decision. This constitutes the decision of the court pursuant to the provisions of the Civil Practice Act. Settle judgment making provision for an accounting as above set forth, for the time within which such account is to be filed, for the time when objections are to be filed and for appointment of a referee to take and state the account.