2 F.3d 1098
 In re The MONETARY GROUP, The Securities Groups, The
Securities Group 1980, The Securities Group, Debtors.
The SECURITIES GROUPS, The Securities Group, The Monetary
Group, The Securities Group 1980, Plaintiffs-Appellees,
v.
Charles D. BARNETT, Randall W. Atkins, Defendants-Appellants.
 No. 90-3801.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 23, 1993.
 
 Sharon Jacobs Brown, P.A., Plantation, FL, for Charles D. Barnett.
 Leslie S. Osborne, Furr & Cohen, Boca Raton, FL, for Randall W. Atkins and 500 Park Avenue Associates.
 George E. Ridge, William G. Cooper, Jacksonville, FL, for plaintiffs-appellees.
 Randy D. Ellison, Klein & Walsh, West Palm Beach, FL, for Charles D. Barnett.
 Appeal from the United States District Court for the Middle District of Florida.
 Before COX, Circuit Judge, MORGAN and HENDERSON, Senior Circuit Judges.
 PER CURIAM:
 
 
 1
 Charles D. Barnett and Randall W. Atkins were partners in related partnerships that sought Chapter 11 bankruptcy protection. A court-appointed administrator initiated adversary proceedings against Barnett, Atkins and others on behalf of the partnerships, predicated upon breach of fiduciary duty, conversion, misappropriation of partnership assets and opportunities, and violation of the federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Secs. 1961-1968. Following a bench trial, the bankruptcy court found Barnett, Atkins, and others liable to the partnerships for almost $32 million. In re Securities Groups, 89 B.R. 204 (Bankr.M.D.Fla.1988). Barnett and Atkins appealed to the district court, which affirmed in an unpublished order. Barnett and Atkins appeal the district court's judgment. We affirm as to Atkins but reverse as to Barnett.
 
 I. BACKGROUND
 A. Facts
 
 2
 The facts stated are undisputed unless otherwise noted. The plaintiffs-appellees are The Securities Group ("TSG"), a New York limited partnership formed in 1978; The Monetary Group ("TMG"), a New York limited partnership formed in 1979; The Securities Group 1980 ("TSG80"), a New York limited partnership formed in 1980; and The Securities Groups ("Groups"), a New York general partnership formed in 1979 whose general partners included TSG, TMG and, later, TSG80 (hereinafter referred to collectively as "plaintiffs").
 
 
 3
 The defendants-appellants, Charles Barnett ("Barnett") and Randall Atkins ("Atkins"), were general partners in TSG at all relevant times. Additionally, both were limited partners in TMG, and Barnett was a limited partner in TSG80.
 
 
 4
 The plaintiffs also sued three additional defendants who are not parties to this appeal. Among these was a Kentucky limited partnership called 500 Park Avenue Associates ("Associates"). Atkins was a limited partner in Associates and acted as counsel in its formation. Associates was formed in 1979 to acquire certain real estate in New York City which is at the center of this case.
 
 
 5
 By the time TMG and Groups were formed, TSG was already outgrowing its office space on three floors of the Seagram's Building at 375 Park Avenue in New York City. TSG therefore initiated an office search. Steven A. Considine ("Considine"), then an employee of Ficor, Inc. ("Ficor"), a real estate brokerage company, and Peter G. Schmidt ("Schmidt"), a New York attorney, assisted in the office search. In August of 1979 the search began to focus on the possibility of TSG purchasing the Olivetti Building at 500 Park Avenue and the adjacent Hotel Nassau (jointly, the "Property").
 
 
 6
 Olivetti Properties N.V. ("Olivetti"), an affiliate of Olivetti Corporation of America, owned the Olivetti Building but leased the ground under it from Peter Kalikow ("Kalikow"). The ground lease restricted Olivetti's ability to mortgage or otherwise encumber the building. Olivetti owned both the Hotel Nassau and the fee to its site.
 
 
 7
 TSG submitted its first offer for the Property on September 11, 1979. The partnerships prepared a number of other proposals between September and November, 1979. On November 2, a new offer was tendered to Olivetti. This offer listed "The Securities Groups and/or 500 Park Associates" [sic] as the prospective purchasers. (Plaintiffs' Exh. 7.) The offer referred to Groups and 500 Park Associates as "collectively, 'Securities.' " (Id.) Associates, however, did not exist at the time of this offer. Associates was not formed until December 28, 1979.[1]
 
 
 8
 During the course of the negotiations for the Property, Considine left his employment at Ficor. Ficor subsequently obtained the sole right to obtain financing for the purchase and to lease the Property on behalf of Associates. In return, Ficor agreed to indemnify Associates, TSG, Atkins, Barnett, and others against any claim that Considine might later make for a commission on the Property transaction.
 
 
 9
 On December 26, 1979, Ficor forwarded to Associates, in care of TSG, a commitment letter from Manufacturers Hanover Trust Company to finance Associates' purchase of the Property with a $30 million loan. Security for the loan was to include a first mortgage on the Property and an assignment to the lender of marketable securities worth at least $5 million. At its formation, however, Associates was capitalized with only $10,000.
 
 
 10
 Associates proposed to lease space in the Olivetti Building to Groups. Under the ten-year lease, Groups was to occupy three floors of the Olivetti Building. The lease required Groups to post a $1 million rent security deposit. Associates also required a $4 million deposit as security against damage from a structural change that Groups planned for the leased space.[2] A different version of the lease, again dated December 31, later was substituted for the first agreement. The second document provided for a lease of only two floors but required the same security deposits. A third lease, dated January 1, 1980, again provided for the rental of three floors of the Olivetti Building but did not require a security deposit.
 
 
 11
 A 1981 report by the Groups' independent certified public accountants indicated that the Groups paid Associates a $1 million cash rent deposit and a total of $6.8 million, rather than $4 million, in securities for a construction deposit pursuant to a lease dated December 31, 1979. The accountants noted that $5.5 million worth of the securities were returned to Groups by the end of 1980. Evidence in the record indicates that the $1 million cash deposit was eventually returned to Groups with interest. Associates also paid Groups an $800,000 fee for financial consulting services. The bankruptcy court found that the remaining $1.3 million worth of the securities from the construction deposit never went back to Groups, although Atkins disputes that finding.
 
 
 12
 In addition to serving as a special counsel for Associates, Atkins acted briefly as an escrow agent for the transfer of the Groups' lease deposits to Associates. On December 30, 1979, Groups transferred $1 million in cash and $4 million worth of certificates of deposit to Atkins in escrow. The following day, acting under written instructions from another principal and employee of Groups, Atkins transferred the money and certificates of deposit to Associates pursuant to the terms of the original December 31, 1979, lease. Groups' obligation to pay rent, however, did not begin until six weeks later. Associates immediately gave the $1 million in cash to Olivetti as a down payment on the Property. The $4 million worth of certificates of deposit went into an escrow account under the joint control of attorneys for Associates and Olivetti.[3]
 
 
 13
 Olivetti's total sale price for the Property was $22 million. Associates entered into a separate agreement with Kalikow to acquire rights under the Olivetti Building ground lease for $3 million. A few days before Associates and Olivetti executed their initial contract, the Property had been appraised at not less than $40 million.
 
 
 14
 Associates closed on its $30 million loan from Manufacturers Hanover Trust Company on April 17, 1980. Along with a mortgage on the Property, security for the loan included the $6.8 million in marketable securities provided by Groups to Associates as a construction deposit. Also on April 17, Associates completed its $22 million purchase from Olivetti.[4]
 
 
 15
 Most of the limited partners of the plaintiffs were not told in advance about the details of Associates' purchase of the Property. After the fact, audited financial statements of the plaintiffs provided some details about Groups' lease with Associates.
 
 
 16
 Associates quickly placed the Property on the market. In September 1981, Associates sold the Property to Equitable Life Assurance Society of the United States ("Equitable") for a total of $54.5 million plus a share of Equitable's future profits from development of an office condominium tower on the Hotel Nassau site.[5] Attendant to the sale, Associates assigned to Equitable the lease between Groups and Associates dated January 1, 1980, which did not provide for a security deposit.
 
 B. Procedural History
 
 17
 The present action began as four adversary proceedings filed in bankruptcy court by the plaintiffs' post-confirmation administrator.[6] The bankruptcy court consolidated the four actions for trial.
 
 
 18
 The bankruptcy court issued its findings of fact and conclusions of law in July, 1988. In re Securities Groups, 89 B.R. 204 (Bankr.M.D.Fla.1988). The court found that the plaintiffs failed to establish a RICO violation. Id. at 218-19. The court, however, declared that Atkins[7] and Barnett were "guilty of conversion, unauthorized use of partnership funds for non-partnership purposes, usurping a partnership opportunity and of violating their fiduciary responsibilities to the partnerships." Id. at 219. Therefore, the court imposed "a constructive trust on all gains received by the defendants from the resale of the property." Id. The court determined that the net amount due the plaintiffs was $31,975,100. Id. at 220.
 
 
 19
 Atkins, Barnett, and others appealed the bankruptcy court's judgment to the district court. The district court affirmed the final judgment of the bankruptcy court in an amended order dated July 20, 1990. (R.2-30 at 2, 10.) The court found sufficient evidence to support the judgment against Barnett. (Id. at 6 n. 2.) As to Atkins, the district court upheld all of the bankruptcy court's factual findings and most of its legal conclusions with little or no discussion. (Id. at 5.) Most of the district court's analysis focused on the defendants' assertions that the conversion claim was barred by the statute of limitations and that the bankruptcy court miscalculated the profits from the Property's sale. The district court agreed with the bankruptcy court on both issues. The parties have not raised either issue on appeal from the district court's judgment.[8]
 
 II. ISSUES ON APPEAL
 
 20
 In this opinion we address the following issues:
 
 
 21
 (1) Whether the bankruptcy court erred in finding that Atkins breached his fiduciary duty to the plaintiffs by misappropriating partnership property.
 
 
 22
 (2) Whether the bankruptcy court erred in finding that Barnett participated in or was aware of the misappropriation of partnership property.
 
 
 23
 (3) Whether the bankruptcy court erred in finding that Barnett, as an innocent general partner, was liable for the misuse of plaintiffs' property by his partners.
 
 III. CONTENTIONS OF THE PARTIES
 
 24
 Atkins challenges several of the bankruptcy court's findings. Among these, Atkins disputes the bankruptcy court's factual findings that he converted and misappropriated assets of the plaintiffs to enable Associates to purchase the Property.
 
 
 25
 Barnett makes two arguments. First, Barnett contends that the record contains no evidence that he actually knew about the efforts to acquire the Property for Associates. He points out that he had no interest in Associates and gained nothing from the Property transaction. Rather, Barnett argues that as an interest holder in TSG, he could have gained about $750,000 had TSG purchased the Property instead of Associates. Second, he argues that the bankruptcy court misapplied agency principles in holding that he was liable to the plaintiffs even if he knew nothing about the Property transaction. While an innocent general partner is liable to third parties for the misdeeds of another partner in the apparent scope of partnership business, Barnett argues such liability does not extend as between partners.
 
 
 26
 The plaintiffs contend that partnership property was misappropriated and that Atkins is liable for that misuse. Similarly, regarding Barnett, the plaintiffs defend the bankruptcy court's application of agency principles as well as the court's factual finding that Barnett was involved in or knew about the Property transaction.
 
 IV. STANDARD OF REVIEW
 
 27
 We review the bankruptcy court's factual findings for clear error. In re Sublett, 895 F.2d 1381, 1383 (11th Cir.1990). Determinations of law by either the bankruptcy court or the district court are subject to our de novo review. Id.
 
 V. DISCUSSION
 
 28
 Atkins raises numerous issues and sub-issues in his broad attack on the bankruptcy court's factual findings and legal conclusions. We decline his invitation, however, to become mired in a legal bog. We need not consider all of the questions he raises, if we find any ground in the record supports the judgment below. Young v. Commissioner, 926 F.2d 1083, 1090 (11th Cir.1991).[9]
 
 
 29
 A. Did Atkins owe a fiduciary duty to plaintiffs?
 
 
 30
 A general partner in a limited partnership stands in a fiduciary relationship with the limited partners of that limited partnership. N.Y. Partnership Law Secs. 43(1), 98(1) (Mckinney 1988); Riviera Congress Assoc. v. Yassky, 223 N.E.2d 876, 879 (N.Y.1966).[10] Atkins was a general partner of TSG. Thus, Atkins owed a fiduciary duty to TSG's limited partners. Additionally, TSG was a general partner of Groups. Therefore, because Atkins owed a fiduciary duty as a general partner of TSG and TSG was a general partner of Groups, Atkins' fiduciary duty extended to Groups.
 
 
 31
 A limited partner is liable to the other limited partners of a partnership where that limited partner acts in concert with a general partner of that partnership in derogation of that general partner's fiduciary duty. See May v. Flowers, 106 A.D.2d 873, 483 N.Y.S.2d 551, 551-53 (1984). Atkins was a limited partner of TMG. TSG and TMG were partners operating as Groups. Plaintiffs contend that partners of TSG and TMG misappropriated assets of those partnerships by the wrongful diversion of funds from Groups. Thus, if Atkins violated his duty to TSG as general partner by participating in diverting partnership assets, then Atkins can be said to have joined in the wrong against TMG thereby necessitating the finding that Atkins is liable to the other limited partners of TMG. As discussed hereafter, we find that Atkins breached his fiduciary duty to TSG by participating in the misappropriation of partnership property. We therefore find Atkins liable to TMG.[11]
 
 
 32
 B. Was the plaintiffs' property misappropriated?
 
 
 33
 A partner breaches his fiduciary duty where that partner diverts for non-partnership purposes monies belonging to the partnership. Miltland Raleigh-Durham v. Myers, 807 F.Supp. 1025, 1058 (S.D.N.Y.1992). Moreover, partners are liable to each other for such wrongfully appropriated partnership property. Hasday v. Barocas, 10 Misc.2d 22, 115 N.Y.S.2d 209, 213 (N.Y.Sup.1952).
 
 
 34
 The bankruptcy court found that funds and other assets of the plaintiffs were misused, thus enabling Associates to purchase the Property. Substantial evidence in the record supports this finding. Negotiations for the Property were initiated on TSG's behalf. Even after Associates assumed the role of purchaser, the deal depended on the use of plaintiffs' assets. The "security deposits" were obviously tailored to meet Associates' needs. Groups' transfer of the first $5 million in deposits to Associates coincided with the initial closing for the property, six full weeks prior to Groups' obligation to pay rent under its lease. The amount of the deposits matched the amount that the thinly capitalized Associates needed to close on the Property. Moreover, the amount remained the same under a subsequent version of the lease that involved one-third less space. Atkins contends that such a transaction constitutes a valid lease agreement and should not be characterized as a misappropriation of partnership property. This court, however, need not determine whether the dubious lease agreement is tantamount to an indirect misappropriation of partnership property. We need not decide whether the lease agreement was legitimate because the record provides ample evidence of a direct misappropriation of partnership property.
 
 
 35
 The record reflects that when Associates' lender required an additional $2.8 million in security, the malefactors simply transferred an additional $2.8 million from Groups to Associates as an "additional security." The additional $2.8 million was not transferred pursuant to an agreement. Groups was under no contractual obligation to pay Associates an additional security. There is a dearth of evidence in the record to suggest that the transfer of an extra $2.8 million represented anything more than a naked misuse of plaintiffs' property for Associates' benefit. Thus, we find sufficient evidence in the record that Associates directly misappropriated at least $2.8 million worth of plaintiffs' securities. The bankruptcy court's finding that the plaintiffs' funds were misused is not clearly erroneous.
 
 
 36
 C. Did Atkins breach his fiduciary duty by involvement in the misappropriation of plaintiff's property?
 
 
 37
 As we affirm the bankruptcy court's finding that plaintiffs' property was misappropriated, we must next consider whether Atkins was guilty of any wrongdoing. The record demonstrates that Atkins did not play a minor role in the purchase of the Property. Atkins acted as counsel for Associates and as escrow agent for Groups. Hence, Atkins actively participated in the purchase of the property and facilitated the transfer of the "security deposit" from Groups to Associates. Moreover, Atkins enjoyed a personal windfall from the transactions through his limited partnership interest in Associates. Based on his involvement in the transactions, Atkins clearly was aware of the nature of the transactions. Atkins cannot now credibly claim that he was neither aware of, nor participated in, the misappropriation of plaintiffs' property. Under the circumstances, Atkins' conduct directly violated his fiduciary duty as a partner of TSG and TMG to refrain from personally profiting from the misuse of partnership assets. We therefore conclude that the record amply supports the bankruptcy court's factual finding that Atkins wrongfully participated in the transaction. Additionally, we affirm the court's conclusion that such participation constituted a breach of fiduciary duty by Atkins.
 
 
 38
 D. What is the appropriate remedy for Atkins' participation in the misappropriation of partnership property?
 
 
 39
 Generally, a party injured by a breach of an obligation imposed by law or agreement is entitled to compensatory relief. But where a party misappropriates the property of another, to whom that party owes a fiduciary duty, then the malefactor is liable for both the misappropriated property as well as the profits realized therefrom. Hasday, 115 N.Y.S.2d at 213. This principle extends to the case where the wrongdoer has an interest in the misappropriated property. Id. Thus, partners are liable to each other for the fruits of misappropriated partnership property. Id. Where a partner is found liable for the misuse of partnership assets, "[a] constructive trust is, then, the remedial device through which preference of self is made subordinate to loyalty to others." Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 547 (1928).
 
 
 40
 In the instant case, the bankruptcy court found that Atkins participated in the misappropriation of plaintiffs' property. Accordingly, the court imposed a constructive trust on all profits realized by the resale of the Property. We find no error in the imposition of a constructive trust on the profits realized from the misappropriated partnership assets.
 
 
 41
 E. Did Barnett actively participate in the misappropriation of plaintiffs' property?
 
 
 42
 The bankruptcy court concluded that Barnett violated his fiduciary duty to plaintiffs "by virtue of his active participation in the acquisition of the Property." In re Securities Groups, 89 B.R. at 215.[12] Whether or not Barnett actively participated in the Property transactions presents a question of fact that we must review for clear error.
 
 
 43
 The record provides scant evidence suggesting that Barnett participated in, or knew about, the purchase of the Property. The record does indicate that Ficor agreed to indemnify Barnett along with TSG, associates, Atkins, and others against any claim by Considine for commission relating to the purchase of the Property. Barnett's inclusion in the indemnity letter without more, however, no more indicates wrongdoing on his part than the inclusion of TSG indicates complicity by that plaintiff.
 
 
 44
 Plaintiffs note that Barnett was associated with a large law firm that rendered a legal opinion about the property purchase. Barnett, however, did not himself provide a legal opinion about the property purchase, and there is no evidence that he was aware of any such advice rendered by the law firm with which he was associated.
 
 
 45
 Additionally, plaintiffs point to the fact that Barnett had gone to New York to help with the termination of a TSG partner prior to the Property transactions and that he also had reviewed plaintiffs' financial statements. Barnett's involvement in terminating a TSG partner prior to the Property transaction does not demonstrate that Barnett knew about the events that occurred several months later. Furthermore, the financial reports Barnett reviewed did not reflect the Property purchase at the time he reviewed them. Thus, Barnett's review of the reports also does not indicate that he knew of the Property transaction.
 
 
 46
 The strongest evidence against Barnett is the deposition testimony of Schmidt, who participated in the Property purchase. Schmidt's testimony linking Barnett to the Property purchase, however, was equivocal at best.[13]
 
 
 47
 Barnett's denial of any involvement in the Property transaction is buttressed by the uncontested facts that Barnett had no interest in Associates and that he derived no benefit from the Property purchase as it transpired. Further, several individuals involved in various aspects of the transaction testified that Barnett was not involved to their knowledge. For example, Considine, the former Ficor employee, said he had no dealings with Barnett and could not even recall ever meeting him. (See Plaintiffs' Exh. 147 at 80, 84.)
 
 
 48
 Based on the record below, we find no substantial evidence to support the bankruptcy court's finding that Barnett participated in, or knew about, the Property transaction. Therefore, our review of the record as a whole leaves us "with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Accordingly, we reverse the bankruptcy court's finding that Barnett participated in, or was aware of, the wrongful property purchase. Since we decline to find Barnett guilty of any individual wrongdoing, we therefore are left to consider whether Barnett can be held vicariously liable for the property purchase.
 
 
 49
 F. Can Barnett as an innocent general partner be held vicariously liable for the misappropriation of plaintiffs' property by fellow partners?
 
 
 50
 The bankruptcy court found that Barnett was liable as a matter of law "by virtue of his position as a general partner of TSG." In re Securities Groups, 89 B.R. at 215. The court explained: "It is immaterial that he may have been unaware of certain portions of the transaction. Partnership liability, like respondeat superior, is based on agency principles. Neither doctrine requires participation in nor knowledge of the acts performed before liability may be imposed." Id.
 
 
 51
 Plaintiffs claim that Barnett is liable even if Barnett personally did not engage in any wrongful conduct. An innocent general partner may be held liable to third parties for the wrongful conduct of a fellow partner even though that partner had no knowledge of the offending partners' action. Clients' Sec. Fund v. Grandeau, 72 N.Y.2d 62, 530 N.Y.S.2d 775, 778, 526 N.E.2d 270, 273 (1988). Plaintiffs contend that New York case law does not limit such agency liability to third parties, but that such liability extends as between partners. Plaintiffs, however, refer us to no cases that have applied this principle of partnership liability in other than the third-party context. Moreover, since the bankruptcy court and the district court issued their opinions in this case, at least one state court has held that an innocent general partner does not bear agency liability to limited partners for another general partner's misuse of partnership funds. Kazanjian v. Rancho Estates, Ltd., 235 Cal.App.3d 1621, 1 Cal.Rptr.2d 534, 536 (1991).[14] We decline plaintiffs' invitation to extend this principle of agency liability to the interpartnership suit context. Potentially, such an extension would make all innocent general partners in a partnership liable to each other for the secret misappropriation of partnership funds by one general partner. We have no reason to believe that either the legislature or the courts of New York intended such a result and therefore decline to follow the tenebrous path that the plaintiffs beckon us to follow. The bankruptcy court erred by imposing such liability on Barnett and we therefore reverse that decision as to Barnett's liability.
 
 VI. CONCLUSION
 
 52
 We AFFIRM the amended order of the district court insofar as it affirms the bankruptcy court's judgment against Randall Atkins. We REVERSE the amended order of the district court insofar as it affirms the judgment against Charles Barnett.
 
 
 53
 AFFIRMED in part, REVERSED in part.
 
 
 
 [1]
 The bankruptcy court gives the date as December 27, but the limited partnership agreement is dated December 28
 
 
 [2]
 The structural change consisted of the construction of a stairwell between two floors
 
 
 [3]
 In his testimony before the bankruptcy court, Atkins confirmed these basic details of the series of paper transactions:
 Q[uestion]: I am asking you: Is the million in cash and four million in certificates of deposits [sic] that you took from The Securities Groups, put into your escrow account and then disbursed from your escrow account, aren't those identically, exactly the same, dollar for dollar, certificate for certificate, how the purchase price, the down payment, was made to Olivetti?
 A[nswer]: Yes.
 Q: And those amounts are identically coincidental to the deposit requirements under the December 31 lease?
 A: Yes, they are.
 (R.6 at 162.)
 
 
 [4]
 Additionally, Associates completed a $3 million transaction with Kalikow to purchase the ground under the Olivetti Building
 
 
 [5]
 The bankruptcy court's findings of fact state the Property's total resale price as $53 million. However, Atkins, in his brief to this court, gives the price as $54.5 million. The higher figure is supported by evidence in the record, including the closing statement for the transaction and the testimony of an accountant who worked for Associates
 
 
 [6]
 The actions were tried in the Middle District of Florida, where the plaintiffs had relocated prior to filing for Chapter 11 protection
 
 
 [7]
 The bankruptcy court expressly declined to consider how another defendant's personal bankruptcy discharge would affect the judgment in this case. In re Securities Groups, 89 B.R. at 220 n. 1. We note that less than a year after the district court affirmed the judgment of the bankruptcy court, Atkins filed a voluntary petition for Chapter 7 bankruptcy relief
 
 
 [8]
 Atkins does challenge the imposition of a constructive trust on all gains from the Property as a remedy for the conversion claim. He does not, however, present an issue about the bankruptcy court's computation of $31,975,100 in total gains from the Property
 
 
 [9]
 For example, Atkins argues that the bankruptcy court incorrectly found that he was a de facto general partner in Associates. Atkins' status with Associates, however, is not at issue. Rather, it is his relationship with plaintiffs that affects his liability
 
 
 [10]
 There is no dispute that New York law governs this aspect of the case
 
 
 [11]
 One of the plaintiffs, TSG80, was not in existence at the time Associates bought the Property. The record is silent about how TSG80 was damaged by the transaction or what duty Atkins could have owed to a yet-to-be-formed partnership. The parties do not address this point, however, so neither do we. See Harris v. Plastics Mfg. Co., 617 F.2d 438, 440 (5th Cir.1980) (holding that appellants abandoned an issue by failing to argue it to the appeals court)
 
 
 [12]
 We are puzzled by the remedy decreed by the bankruptcy court as it pertains to Barnett. The bankruptcy court imposed "a constructive trust on all gains received by the defendants from the resale of the Property." In re Securities Groups, 89 B.R. at 219. A constructive trust is an equitable remedy intended to prevent unjust enrichment. Bankers Sec. Life Ins. Soc'y v. Shakerdge, 49 N.Y.2d 939, 428 N.Y.S.2d 623, 623, 406 N.E.2d 440, 440 (1980); Simonds v. Simonds, 45 N.Y.2d 233, 408 N.Y.S.2d 359, 364, 380 N.E.2d 189, 194 (1978); In re Wieczorek, 186 A.D.2d 204, 587 N.Y.S.2d 755, 756 (1992). The plaintiffs do not assert that Barnett was enriched unjustly or otherwise, by Associates' purchase of the Property. Nor did Barnett control the plaintiffs' assets that were used in the transaction. If Barnett has held neither the assets of the plaintiffs nor any proceeds of those assets, he does not possess property that would be subject to a constructive trust. In any event, because we hold that Barnett is not liable to the plaintiffs, we need not decide the appropriateness of the imposition of a constructive trust as it applies to him
 
 
 [13]
 Schmidt testified, in pertinent part:
 Q[uestion] Have you ever met a gentleman by the name of Charles Barnett?
 A[nswer] Yes, sir.
 Q And how did you first meet Charles Barnett, if you recall?
 A I really do not recall, I am sure it was through either the Atkins or through a man named Jack Jenkins.
 Q Do you recall the circumstances or the reason why you met Charles Barnett?
 A Nothing other than the fact that he was a family friend of the entire Atkins family.
 ....
 Q Did there come a time--well, let me ask you this: Did you ever recall having any conversations with Charles Atkins concerning the office space that you indicated was occupied at 375 Park Avenue [TSG's original location]?
 A Yes, sir.
 Q Do you recall having any conversations about that office space or its adequacy with Randall Atkins?
 A Yes, sir.
 Q The same question as to Orin Atkins?
 A I don't remember it with respect to Orin, I don't recall.
 Q The people that I am asking you if you knew, which included Charles Barnett, the same question as to him.
 A I don't remember if I had conversations with Orin Atkins, Charles Barnett, or Jack Jenkins about the adequacy of the space at 375. I am sure I had conversations about it with all of them at the new space that they took at 500 Park Avenue.
 ....
 Q Do you know about the time this indemnity letter was provided, do you know why Charles Barnett would be one of the persons included on the indemnity?
 ....
 A All of these people had been involved in negotiations to acquire 500 Park Avenue in some way or another.
 ....
 Q Can you tell me in what way or whether Mr. Charles Barnett had been involved in the negotiations to acquire 500 Park Avenue?
 A I cannot remember specifically. I remember there were meetings and telephone conversations that I had with all of these gentlemen at various points of time, from early September of 1979 until the building was closed in 1980.
 Q Where was Charles Barnett when you spoke with him?
 A I think usually out of town. Therefore, I spoke to him on the telephone.
 Q Do you recall what you spoke with him about, what you were speaking with him about?
 A With a huge transaction, there were many, many parties involved, I honestly don't remember. They were family advisors, they being Charlie Barnett and Bernard Barnett. They were friends and family and we discussed many things. We discussed at one point in time whether Ashland Oil would take space at 500 Park Avenue because Orin Atkins, who had been the chairman of Ashland, did not want to get involved in the conflict. Those discussions involved the possibility of Ashland taking space were [sic] carried on behalf of Ashland with others and I would not be surprised if the Barnetts took a party to those.
 Q You don't know whether Charles Barnett took part in any specific discussions on any specific subject matter that you can identify here today?
 A I have no recollection of specific matters that were discussed between me and Charles Barnett.
 ....
 Q If indeed Charles Atkins, Randall Atkins and Charles Barnett were among the original general partners in the Securities Group, the entity named as the addressee of [the Ficor indemnity letter], and Orin Atkins and Bernard Barnett were the original limited partners of the Securities Group, would that explain to you why [the indemnity letter] was addressed to them amongst others?
 ....
 A I really do not know, it could have been an explanation, you know.
 (Plaintiff's Exh. 139 at 9-11, 34, 57-58, 60-61 (emphasis added).)
 
 
 [14]
 The Kazanjian court concluded "that an innocent general partner is not jointly and severally liable with a malfeasant general partner for misappropriation which causes loss to a limited partner. We believe the general partner's exposure to liability to a limited partner should not be as extensive as his potential liability to creditors." Kazanjian v. Rancho Estates, Ltd., 1 Cal.Rptr.2d at 536